******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* JASON GOODE
## (AC 43765)

Cradle, Alexander and Eveleigh, Js.

*Syllabus*

Convicted, after a jury trial, of the crime of assault of public safety personnel, the defendant appealed to this court. The defendant was incarcerated at the time of trial, serving a sentence for a previous conviction of murder. While incarcerated, the defendant was also convicted of various assault charges on three separate occasions. On the day jury selection commenced in his trial, the defendant, who was represented by B, a special public defender who had been assigned as counsel, requested to the trial court that he be appointed new counsel. The court denied that request. The court also denied the defendant's request to have his restraints removed during trial, noting the defendant's extensive criminal history and disciplinary record. *Held*:

1. The trial court did not abuse its discretion in denying the defendant's request for new counsel: although B had represented the defendant for more than one year and the defendant did not make his request until the first day of jury selection, the court thoroughly considered the defendant's complaints against B and explained that B had notified the defendant of his trial date as soon as he had received notice from the court, that B, as an attorney with twenty to thirty years of experience, was well suited to pursue the most effective defense strategy, and B's lack of communication of that strategy with the defendant was due to the defendant's refusal to see or speak to B, and that the defendant would have ample opportunity to discuss his case with B throughout the proceedings; moreover, the defendant indicated that he was willing to commence jury selection with B's counsel, and he did not renew his request for new counsel.

2. The trial court did not abuse its discretion in denying the defendant's request to have his restraints removed and in requiring him to be restrained during trial: the court afforded great consideration to the defendant's right to remain free from restraints during the trial proceedings and implemented the least onerous means of restraining the defendant possible in light of his extensive violent criminal record and disciplinary history, which included 231 disciplinary tickets while incarcerated, and the defendant's threats of assault against his counsel in a prior matter, the court properly having weighed safety concerns against the defendant's rights in employing an intermediate system of restraints; moreover, the court, noting that jurors would already know that the defendant was incarcerated due to the nature of the charge against him and likely would expect him to be restrained, expressly instructed the jury that the use of restraints was routine for inmates while in court; furthermore, neither party objected to the court's proposal of a curative instruction making the jury aware of the restraints, and the jury never heard of the defendant's history that created the security risk.

3. The defendant's claim that the trial court should have inquired further into a potential conflict of interest with B when B indicated to the court that he would not feel comfortable trying the case if the defendant were not shackled was without merit; immediately prior to addressing the shackles issue, the court asked B if he would zealously represent the defendant and B replied that he would, and, although B's safety concerns on the basis of the defendant's violent history were understandable, B did not express that those concerns prevented him from representing the defendant or posed a conflict of interest requiring his removal from the case.

Argued January 26—officially released March 29, 2022

*Procedural History*

Amended information charging the defendant with the crime of assault of public safety personnel, brought to the Superior Court in the judicial district of Hartford,

geographical area number fourteen, where the court, *Gold*, *J.*, denied the defendant's requests for new counsel and to have his restraints removed during trial; thereafter, the matter was tried to the jury before *Gold*, *J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Tamar Rebecca Birckhead*, assigned counsel, for the appellant (defendant).

*Meryl R. Gersz*, deputy assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, and *Christopher Parkilas*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

CRADLE, J. The defendant, Jason Goode, appeals from the judgment of conviction, rendered after a jury trial, of assault of public safety personnel in violation of General Statutes § 53a-167c (a) (1). On appeal, the defendant claims that the court erred by (1) denying his request for new counsel, (2) requiring him to remain shackled in the courtroom during his trial, and (3) not inquiring into a potential conflict of interest with his counsel. We affirm the judgment of the trial court.

On May 29, 2018, the defendant was charged with the assault of an employee of the Department of Correction in violation of § 53a-167c (a) (1) in connection with an incident that occurred on January 5, 2018, while the defendant was incarcerated at the MacDougal-Walker Correctional Facility (MacDougal). By way of an amended information filed on July 29, 2019, the state alleged: "[O]n or about January 5, 2018, at approximately 2:55 p.m. in the professional visitation room area of . . . MacDougal . . . [the defendant], with the intent to prevent Matthew Mann, an identifiable employee of the State of Connecticut Department of Correction, from performing his duties as a Department of Correction Officer and while acting in the performance of such duties, caused physical injury to . . . Mann by swinging his right fist and striking . . . Mann on the right side of his face and neck, thereby causing physical injury . . . ." The defendant pleaded not guilty and elected a jury trial. Following that trial, the jury found the defendant guilty as charged, and the defendant thereafter was sentenced to ten years of incarceration, to run consecutively to the sentence he was then serving.[1] This appeal followed.

On appeal, the defendant claims that the court erred by (1) denying his request for new counsel, (2) requiring him to remain shackled during his trial, and (3) not inquiring into a potential conflict of interest with his counsel. We address each claim in turn.

I

The defendant first claims that the court abused its discretion in denying his request for new counsel.[2] We are not persuaded.

The following procedural history is relevant to our analysis of this claim. On June 14, 2018, the defendant was arraigned on the aforementioned charge and the Office of the Public Defender was appointed to represent him. Attorney J. Patten Brown was thereafter appointed as a special public defender to represent the defendant, and he filed his appearance on behalf of the defendant on July 3, 2018.

On July 29, 2019, the defendant and Brown appeared before the court to commence jury selection for the defendant's trial. At the outset of that proceeding, the

court noted that the defendant was represented by Brown, and the defendant interjected and stated, "That's incorrect, Your Honor." Brown then explained to the court that the defendant had informed him that he was fired but that he told the defendant that he needed to address the court because the court had appointed him to represent the defendant. Brown told the court that the defendant had expressed a desire for different counsel to represent him.

The court then asked the defendant to explain his position. The defendant told the court that Brown did not give him timely notice of his trial date and, therefore, that he had not been afforded an opportunity to prepare for trial. The defendant further complained that Brown had not "erected" a defense to the charge for which he was being tried. The defendant told the court, "I told Brown on June 24, the last time we were in Enfield Superior Court, that I needed to have the criminal investigator come up to corroborate or verify these witnesses' statements against me. No investigator popped up. He hasn't even appeared to the jail to visit me to discuss this case or any other pretrial motions that the state may have against me or any evidence like this, unprepared. This is unprepared, man."

In response to the defendant, the court explained that it would address his complaints in order, beginning with his complaint that he learned of his trial date only a few days earlier. The court explained to the defendant that his case had been pending since June, 2018, and, because it was on the trial list, it was subject to being "called in for immediate trial at any point given that the pretrial discussions about the case weren't able to work it out." The court informed the defendant that Brown had been contacted by the clerk's office and notified of the upcoming trial date just the previous week, and Brown, in turn, immediately notified the defendant.

The court then turned to the defendant's complaint that Brown had not sufficiently investigated the charge against him. Brown explained that, because the defendant had informed him that he no longer wished to speak to him or wanted his representation, he had opted not to waste time driving to the correctional facility. Brown told the court, however, that his investigators had met with the defendant at the prison. When pressed by the court, the defendant admitted that Brown had retained "a number of investigators" and that one had visited him at the correctional facility at least two times and reviewed "some insignificant video footage" with him. The defendant described another investigator who met with him at the correctional facility and discussed potential plea negotiations but never shared with him any details regarding a potential defense strategy. Brown assured the court that he had conducted an appropriate investigation so that he could zealously

represent the defendant. Brown informed the court that he had identified three potential witnesses that may be helpful to his defense but, because those witnesses were employees of the Department of Correction, he could not compel them to speak to him prior to trial.

The court explained to the defendant that Brown, as an attorney with twenty to thirty years of experience, would understand the strengths and weaknesses of the state's case and would identify the best manner to represent the defendant and cross-examine the state's witnesses. Although the defendant sought to have Brown explain his defense strategy on the record, the court declined to compel Brown to do so "because if he says it to me on the record, then the prosecutor gets a sneak preview of what the defense is going to be."

The court told the defendant that there was no reason to remove Brown from representing him and asked the defendant if he could afford to hire his own lawyer who would be ready to represent him at trial the next week. The defendant indicated that he could not and that he was unable to represent himself because he was in long-term solitary confinement at the prison with no access to the legal resource center. When the defendant persisted with his complaint that Brown had not adequately communicated or discussed his case with him, the court again advised the defendant of his right to represent himself and offered to appoint Brown as standby counsel. The court explained that it was not, however, advising the defendant to represent himself. It explained the advantages of having an attorney to represent him and asked the defendant about his history with Brown. The defendant informed the court that Brown had been representing him for approximately one and one-half years and that either Brown or one of the other attorneys in his firm had met with him on each of the numerous times that he previously had been brought to the courthouse. The court again explained to the defendant that Brown had investigated his case, reviewed witness statements, and identified potential defenses. The defendant again expressed his frustration that Brown had not shared his trial strategy with him, but, when the court asked the defendant if he was going to allow Brown to represent him at trial, the defendant responded, "I might take him for now but, you know, in the midst of the trial he may be gone." The defendant suggested to the court that either Brown or one of the attorneys in his firm should have prepared him and explained the jury selection process to him. The court asked Brown, and Brown agreed, to use considerable efforts to keep the defendant apprised of the proceedings as the trial proceeded. The court told the defendant that Brown was willing to work with him, that Brown had already done a lot of work on his case, and that the defendant had to be willing to work together as well. The defendant again asked to see Brown's work, arguing that none of it had been shared with him. The

court reiterated that it would not be wise to "tip off" the state as to Brown's defense strategy and then asked the defendant if he was willing to commence the proceedings that day with Brown representing him. The defendant responded, "We can get going today, but this is what I'm saying. If at any point during the trial or the proceedings something doesn't go to my liking and stuff like that, he's got to go . . . ." The court warned the defendant that he would not be allowed to simply dismiss Brown in the middle of trial, explained that the court would make that decision, and again asked the defendant if he was ready to proceed with Brown representing him. The defendant reiterated, "We can get it going, but like I said I want things as far as I expressed to you." The court agreed that the defendant would have opportunities to speak to Brown throughout the proceedings. On the basis of the foregoing, Brown continued to represent the defendant through his trial, and the defendant did not renew his request for new counsel at any point thereafter.

The following legal principles guide our analysis of the defendant's claim that the court erred in denying his request for new counsel. "It is well established that [a] defendant is not entitled to the appointment of a different public defender to represent him without a valid and sufficient reason. . . . Nor can a defendant compel the state to engage counsel of his own choice by arbitrarily refusing the services of a qualified public defender. . . . When reviewing the adequacy of a trial court's inquiries into a defendant's request for new counsel, an appellate court may reverse the trial court only for an abuse of discretion. . . . [Of course, a] trial court has a responsibility to inquire into and to evaluate carefully all substantial complaints concerning court-appointed counsel . . . . The extent of that inquiry, however, lies within the discretion of the trial court. . . . When a defendant's assertions fall short of a seemingly substantial complaint, we have held that the trial court need not inquire into the reasons underlying the defendant's dissatisfaction with his attorney." (Citations omitted; internal quotation marks omitted.) *State* v. *Davis*, 338 Conn. 458, 466–67, 258 A.3d 633 (2021).

"[An appellate court] must distinguish between a substantial and timely request for new counsel pursued in good faith, and one made for insufficient cause on the eve or in the middle of trial. . . . In evaluating whether the trial court abused its discretion in denying [the] defendant's motion for substitution of counsel, [an appellate court] should consider the following factors: [t]he timeliness of the motion; adequacy of the court's inquiry into the defendant's complaint; and whether the attorney/client conflict was so great that it had resulted in total lack of communication preventing an adequate defense." (Internal quotation marks omitted.) *State* v. *Wood*, 159 Conn. App. 424, 432, 123 A.3d 111 (2015).

In the present case, although Brown had represented the defendant for more than one year, the defendant did not ask the court to appoint new counsel until the first day of jury selection. Despite this untimely request, the record reflects that the court allowed the defendant to fully express his complaints concerning Brown's representation of him. As previously indicated, the defendant raised two principal complaints that he claimed justified his request for new counsel—that Brown had given him short notice of his trial date and that Brown had never visited him at the correctional facility to discuss his defense strategy with him. The court thoroughly considered both of those complaints.

As to the defendant's first complaint, the court explained to the defendant that, because his case was on the trial list, it was subject to being called in for trial at any time and that Brown notified him of his trial date immediately after he received notice from the court. As to his second complaint, the court explained to the defendant that a lot of work that an attorney performs to prepare a case for trial occurs behind the scenes, at the attorney's office, and not necessarily with the client. Brown explained to the court that he had identified three witnesses who may be helpful to his defense but that he could not compel them to speak with him prior to trial because they were employees of the Department of Correction. The court assured the defendant that Brown, who had between twenty and thirty years of experience, was well suited to identify the strengths and weaknesses of the state's case and to pursue the most effective defense strategy. Although Brown had not yet discussed that strategy with the defendant, that lack of communication was borne of the defendant's statement that he did not wish to see or speak to Brown. The court assured the defendant that he would have ample opportunity to discuss his case with Brown throughout the proceedings.

After the court addressed the defendant's complaints at length, the defendant, albeit reluctantly, indicated that he was willing to commence jury selection with Brown's counsel, and he did not thereafter renew his request for new counsel. On that basis, it reasonably may be inferred that the court's inquiry assuaged the defendant's concerns with Brown. Accordingly, we cannot conclude that the court abused its discretion in denying the defendant's request for new counsel.

II

The defendant next claims that the court abused its discretion when it denied his request to have his shackles removed and violated his constitutional right to due process by requiring him to be shackled during his trial. We disagree.

After denying the defendant's request for new counsel, the court addressed the issue of the defendant's

shackles. The defendant argued that he would be prejudiced if he were required to wear them throughout his trial. In response, the state recounted the defendant's criminal history and disciplinary record. The state represented that the defendant had been charged with murder in 1995 and, pursuant to a plea agreement, had been sentenced to thirty-five years of incarceration. While he was incarcerated, the defendant was convicted of assault in the third degree in 2009, assault in the third degree in 2014, and assault of a correction officer in 2016. The state also told the court that the defendant had an extensive disciplinary record. Upon reviewing the defendant's disciplinary record, the court noted that the document presented by the state consisted of six pages, which reflected approximately thirty-five disciplinary tickets but only dated back to 2015, despite the fact that the defendant had been incarcerated since 1994. The defendant, who had been disciplined numerous times for interfering with safety security, threatening and assault, acknowledged that his disciplinary record dating back to 1994 would be "a lot longer than six pages."

When asked by the court for his position as to whether the defendant should be restrained throughout the trial, Brown responded, "I have never taken this position in the past, but I don't feel comfortable trying the case with [the defendant] if he's not shackled." The defendant argued that he had been in court numerous times, without restraints and without incident.

The court told the defendant that the leg shackles would remain on him and next addressed the issue of the defendant's handcuffs. The defendant told the court that he had no objection to being handcuffed but requested the removal of the belly chain and the black box that connected all of his shackles and restricted the movement of his hands.[3] The court compromised on an "intermediate restriction which is something less than the full set up . . . that still involved the use of a tether chain which restricted [the defendant's] ability to move his arms far from his belly but would give him sufficient leeway to be able to write should he wish to do so during his proceedings. But his ability to move his hands is restrained sufficiently so that it would require quite an effort for him to get anywhere close to Brown, who is seated next to him, and the correction guards are seated in such a way as to make that course of action unlikely and will protect Brown's safety as we move forward. I had determined based on my more careful review . . . that these significant security measures must be put in place as we move forward." The court noted that it could have Brown sit further away from the defendant but thought that might be prejudicial in giving the jury the sense that Brown does not feel safe near the defendant. The court explained that the tether chain was necessary to ensure the safety of court personnel. The court noted that, in another case that

had been pending in Norwich, the defendant previously had stated in open court that he intended to assault his counsel and that the defendant either had taken a swing at him or threatened to do so. The court indicated that it had further reviewed the defendant's disciplinary record, and, in fact, the defendant had received 231 disciplinary tickets, that he had to be transported to court separately via special transport due to the security risks he presents, and that he had assaulted a correction employee as recently as June 24, 2019. The court further noted that the defendant was then incarcerated at Northern Correctional Institute, the state's maximum security facility and, due to his disciplinary history, was in solitary confinement. On those bases, the court opined that the defendant was "one of the most carefully guarded defendants in the state of Connecticut right now and certainly his disciplinary record leaves me [with] significant concern that he will maintain appropriate . . . decorum during the course of the proceedings." The court directed that correction officers would remain in the courtroom to assist the marshals in case the defendant did not "maintain appropriate decorum."

The court summarized the rationale for its decision as follows: "I think that any prejudice that would arise from either the restraints themselves or from the correction officers' presence here in the courtroom is significantly minimized given the fact that the jury will know from the very start when I recite the charges that this is an assault of a correction officer so they will know that the defendant is incarcerated. The fact that there are [correction officers] in the courtroom and that the defendant is restrained seems to me [that] it's very likely [to] be something that jurors would have expected to be the case. I don't think that a layperson would assume that an individual who is serving a prison sentence would be allowed to be free of restraints while he is seated in a courtroom any more than he is not restrained in a broader sense while he is in the correction institute itself.

"Now I have chosen, based on the options available to me, what I think is a middle ground of security by using the tether without the black box and I have done so for the reasons that I've stated." The court observed that, as long as the defendant kept his chair close to the table, the jury would not be able to see any of the restraints. The court indicated that it would instruct the potential jurors at the outset that it was routine for correction officers to remain present in court with an inmate and for the inmate to remain shackled. Brown agreed with the court's proposal. Accordingly, the court so instructed the jurors.[4]

We begin by setting forth the legal principles that govern our analysis of this claim, including the applicable standard of review. "[I]n reviewing a shackling

claim, our task is to determine whether the court's decision to employ restraints constituted a clear abuse of discretion. . . .

"Central to the right to a fair trial, guaranteed by the [s]ixth and [f]ourteenth [a]mendments [to the United States constitution], is the principle that one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial. . . . [C]ourts must be alert to factors that may undermine the fairness of the fact-finding process. In the administration of criminal justice, courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt. . . . Thus, [i]n order for a criminal defendant to enjoy the maximum benefit of the presumption of innocence, our courts should make every reasonable effort to present the defendant before the jury in a manner that does not suggest, expressly or impliedly, that he or she is a dangerous character whose guilt is a foregone conclusion. . . .

"Accordingly, [i]t is well established that, [a]s a general proposition, a criminal defendant has the right to appear in court free from physical restraints. . . . Grounded in the common law, this right evolved in order to preserve the presumption favoring a criminal defendant's innocence, while eliminating any detrimental effects to the defendant that could result if he were physically restrained in the courtroom. . . . The presumption of innocence, although not articulated in the [c]onstitution, is a basic component of a fair trial under our system of criminal justice. . . . [C]ourts and commentators share close to a consensus that, during the guilt phase of a trial, a criminal defendant has a right to remain free of physical restraints that are visible to the jury; [and] that the right has a constitutional dimension . . . .

"Nonetheless, a defendant's right to appear before the jury unfettered is not absolute. . . . A trial court may employ a reasonable means of restraint [on] a defendant if, exercising its broad discretion in such matters, the court finds that restraints are reasonably necessary under the circumstances. . . . For example, a defendant's right to remain free of physical restraints that are visible to the jury . . . may be overcome in a particular instance by essential state interests such as physical security, escape prevention, or courtroom decorum. . . . Because [a] trial judge has a duty to do what may be necessary to prevent escape, to minimize danger of harm to those attending trial as well as to the general public, and to maintain decent order in the courtroom . . . [s]hackles may properly be employed in order to ensure the safe, reasonable and orderly

progress of trial. . . .

"Despite the breadth of [the court's] discretion, however, [t]he law has long forbidden routine use of visible shackles during the guilt phase . . . . [T]he [f]ifth and [f]ourteenth [a]mendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial. . . .

"Practice Book § 42-46 mandates in relevant part: In ordering the use of restraints or denying a request to remove them, the judicial authority shall detail its reasons on the record outside the presence of the jury. The nature and duration of the restraints employed shall be those reasonably necessary under the circumstances. . . . Although a trial court is not mandated to conduct an evidentiary hearing concerning the necessity for restraints, our appellate review is greatly aided when a court develops the record by conducting [such] an evidentiary hearing . . . ." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *McCarthy*, 210 Conn. App. 1, 39–43, 268 A.3d 91 (2022).

Here, the record reflects that the court afforded great consideration to the defendant's right to be free from restraints throughout his trial proceedings. After thorough consideration, the court implemented the least onerous means of restraining the defendant possible in light of his extensive violent criminal record and disciplinary history. Although the restraints may have been visible to the jury, it cannot reasonably be argued that the defendant's history did not justify the court's safety concerns and the employment of restraints. Despite the defendant's history of violence, the court considered the potential prejudice to the defendant that might be caused by the shackles, in addition to the defendant's right to participate in his defense. In employing an intermediate system of restraining the defendant, the court properly exercised its discretion by carefully weighing the safety concerns and the rights of the defendant.

Moreover, the court aptly noted that, because the defendant was being tried for assaulting a correction officer, the jury would already know that the defendant was incarcerated and likely would expect him to be restrained due to that incarceration. See *State* v. *Taylor*, 63 Conn. App. 386, 395–96, 776 A.2d 1154 (prejudicial effects of shackling were negligible where defendant was being tried for offenses such as escape from prison or assault of prison guard because nature of charges and evidence presented would inevitably convey to jury that defendant already was convict and prisoner), cert. denied, 257 Conn. 907, 777 A.2d 687, cert. denied, 534 U.S. 978, 122 S. Ct. 406, 151 L. Ed. 2d. 308 (2001). Indeed, the court expressly instructed the jury that the use

of restraints was routine because the defendant was incarcerated. Therefore, not only was there a sound and logical explanation for the use of restraints that was wholly unconnected to any potential risk of violence by the defendant, but the court's curative instruction underscored the logic of that explanation by telling the jury that it was routine for inmates to remain restrained while in court.

The defendant also argues that the court erred by sua sponte making the jury aware of the shackles and that its instructions to the jury were insufficient to cure the prejudice to the defendant. Although the court did make the initial proposal of a curative instruction, it afforded the parties an opportunity to be heard on that instruction, and neither party objected. As noted, the restraints ordered by the court were necessary for security purposes due to the defendant's history. The jury appropriately never heard about that history, and, instead, was instructed that the use of restraints was routine, rather than a necessary safeguard to the potential threat posed by the defendant. Accordingly, we conclude that the defendant's claim is unavailing.

### III

The defendant finally claims that the court "failed to uphold its affirmative duty to inquire with respect to a conflict of interest by [Brown] when [Brown] expressed fear of the defendant, stating to the court that he did not feel 'comfortable' trying the case if the defendant were not shackled, thereby violating the defendant's [rights under the state and federal constitutions]." The defendant claims that Brown's conflict became evident when Brown failed to argue for less restrictive restraints to be placed on the defendant or that "it would be less prejudicial for no restraints to be visible to the jury, rather than drawing attention to the restraints and relying on a curative instruction." We are not persuaded.

"It is axiomatic that a criminal defendant's sixth amendment right to the effective assistance of counsel includes the right to counsel that is free from conflicts of interest. . . . It is a fundamental principle . . . that an attorney owes an overarching duty of undivided loyalty to his [or her] client. At the core of the sixth amendment guarantee of effective assistance of counsel is loyalty, perhaps the most basic of counsel's duties. . . . Loyalty of a lawyer to his [or her] client's cause is the sine qua non of the [s]ixth [a]mendment's guarantee that an accused is entitled to effective assistance of counsel. . . . That guarantee affords a defendant the right to counsel's undivided loyalty. . . .

"In cases involving potential conflicts of interest, this court has held that [t]here are two circumstances under which a trial court has a duty to inquire . . . (1) when there has been a timely conflict objection at trial . . . or (2) when the trial court knows or reasonably should

know that a particular conflict exists . . . . To safeguard a criminal defendant's right to the effective assistance of counsel, a trial court has an affirmative obligation to explore the possibility of conflict when such conflict is brought to the attention of the trial judge in a timely manner. . . .

"In such circumstances, [t]he court must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all. . . . We review the defendant's claim that the trial court failed to inquire into a possible conflict of interest as a question of law, and, as such, it is subject to plenary review." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Davis*, supra, 338 Conn. 469–71.

The defendant argues that Brown's statement to the court that he would not feel comfortable representing the defendant if the defendant were not restrained demonstrated a conflict of interest.[5] Based on the defendant's violent history, including his assault of a correction officer just one month earlier and his previous in-court threat against his prior attorney, Brown's safety concerns were understandable. Despite Brown's well-founded safety concerns, he did not, at any point, express that those concerns prevented him from representing the defendant or posed a conflict of interest requiring his removal from the case. In fact, immediately prior to addressing the shackles issue, the court considered the defendant's request for new counsel, during which, as iterated herein, the court asked Brown if he would zealously represent the defendant, and Brown assured the court that he would. We therefore conclude that the defendant's claim that the court should have inquired further into a potential conflict of interest is without merit.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In 1995, the defendant was convicted of murder in violation of General Statutes § 53a-54a and was sentenced to a thirty-five year term of incarceration. As discussed herein, the defendant was subsequently sentenced for additional offenses that he committed while he was incarcerated.

[2] The defendant also claims that the denial of his request for new counsel violated his rights to counsel and due process under the state and federal constitutions. Because we conclude that the court did not abuse its discretion in so ruling, we do not reach the defendant's constitutional claims.

[3] The court explained: "That black box was part of a restraint device which in corrections is known as a full set up and it essentially tethered [the defendant's] hands to the black box, which was part of a belly chain and prevented [the defendant] from moving his hands away from his belly at all."

[4] The court instructed the jurors, inter alia: "Now the charge, as you know, is the charge as I just told you, assault of an employee of the Department of Correction. You will [learn] during this trial that the defendant is incarcerated and was at the time of the alleged offense. It is for that reason that you'll see in the courtroom, and this is done as a routine practice, seated behind [the defendant] are two members of the Department of Correction. And they are joined also by members of our courthouse security, and they are called marshals. That is routine practice. You may also during the course

of the trial come to learn that the defendant is restrained in certain ways; that is also a matter of routine. It is not something that is done specifically in this case, but, as I say, it's a matter of routine. The fact that there are correction officers in the courtroom along with our marshals, the fact that the defendant may be, you may come to notice, subject to some restraint, those factors are not in any way relevant or material to the decision that you're going to be asked to make in this case."

[5] After Brown expressed that concern, the defendant noted, inter alia, "[T]his is not starting off well as he's telling me he doesn't feel comfortable, because I never did nothing to this man."

---